# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Augusta Division

In the matter of:                          )
                                           )
                                           )
SPORTSMAN'S LINK, INC.                     )
(Chapter 7 Case Number <u>07-10454</u>)    )
                                           )
                                           )
        *Debtor*                           )
                                           )
                                           )
                                           )

**FILED**
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
*By lbarnard at 2:07 pm, May 24, 2011*

| | |
|---|---|
| EDWARD J. COLEMAN, III          ) | Adversary Proceeding |
| *Plaintiff*          ) | Number <u>09-1048</u> |
| v.          ) | |
| AMERICAN CONCRETE, INC.          ) | |
| *Defendant*          ) | |

EDWARD J. COLEMAN, III                     )          Adversary Proceeding
                *Plaintiff*                )          Number <u>09-1058</u>
v.                                         )
SOUTHERN BANK                              )
                *Defendant*                )
                                           )
                                           )

EDWARD J. COLEMAN, III                     )          Adversary Proceeding
                *Plaintiff*                )          Number <u>09-1059</u>
v.                                         )
FIRST BANK OF GEORGIA                      )
                *Defendant*                )
                                           )
                                           )

EDWARD J. COLEMAN, III                     )          Adversary Proceeding
                *Plaintiff*                )          Number <u>09-1065</u>
v.                                         )
GEORGIA BANK AND TRUST                     )
  COMPANY OF GEORGIA                       )
                *Defendant*                )
                                           )

EDWARD J. COLEMAN, III )                   Adversary Proceeding
        *Plaintiff* )                   Number 09-1070
v. )
ALEXANDER MOTORS, INC. )
        *Defendant* )

## MEMORANDUM AND ORDER

Debtor filed Chapter 11 on March 13, 2007. That case was converted to a Chapter 7 proceeding on July 22, 2008. Edward J. Coleman, III was appointed Chapter 7 Trustee, began an orderly liquidation of Debtor's estate, and commenced litigation against numerous Defendants. Among those cases are the above-captioned Adversary Proceedings which have been the subject of extensive discovery and pre-trial proceedings. In each of these cases the Trustee seeks recovery of pre-petition transfers, alleging that they were preferential or fraudulent under 11 U.S.C. §§ 547 and 548.

Under both theories of recovery the Trustee bears a similar burden of proof. The Trustee must show that Debtor made the transfer "while the debtor was insolvent" for purposes of § 547, or that Debtor "was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer or obligation" for purposes of § 548. Because of the multiplicity of transactions and complexity of the individual fact patterns, it has been stipulated by the parties, and agreed to by the Court, that bifurcated proceedings would be conducted. In the first phase of the litigation, the Court conducted a trial on the threshold issue of whether Debtor was insolvent at the time of the transfers, or whether Debtor became insolvent as a result of any of the transfers at issue. That phase is the subject

of this Order.  Trial was conducted on February 17, 2011.  All briefs were timely received as of April 29, 2011, and have been reviewed by the Court.  Based on the entire record I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The initial transfers by Debtor in each of the cases are as follows:

1.  To American Concrete, a check for $19,891.30 on September 26, 2006 (seeking total pre-petition recovery of $19,891.30);

2.  To Southern Bank, a payment in the amount of $672.65 on December 6, 2005 (seeking total pre-petition recovery of $87,241.52);

3.  To First Bank of Georgia, a check for $8,296.16 on February 7, 2006 (seeking total pre-petition recovery of $107,850.06);

4.  To Georgia Bank & Trust, a check for $2,308.70 on March 19, 2005 (seeking total pre-petition recovery of $284,180.28); and

5.  To Commercial Bank, a wire for $72,495.00 on July 27, 2006 (seeking total pre-petition recovery of $72,495.00).

For the Trustee's § 548 cases to succeed, Debtor must have been insolvent within two years of the date of the filing of the petition, and for the Trustee's § 547 cases to succeed, Debtor

must have been insolvent within one year of the date of the filing of the petition.[1]  Therefore the threshold question is whether Debtor was insolvent on or after March 13, 2005. Debtor's balance sheet shows that it was solvent until sometime in 2007 (Exhibit D-3) and its schedules show that it was solvent as of the date of filing.  Summary of Schedules, Dckt. No. 40, p. 3.  The Trustee attacks this showing of solvency in four ways: Trustee alleges that 1) Debtor drastically overstated the value of its inventory; 2) Debtor overstated the value of a receivable from Power Link; 3) Debtor failed to list a large guaranty obligation as a liability on its schedules; and 4) Debtor overstated the value of a lawsuit against U.S. Properties in its schedules.  For the reasons that follow, I find that Debtor's balance sheets and schedules reflect Debtor's fair value as of the time they were dated, and that Debtor was not insolvent at the time of the transfers.

## 1.  The Fair Value of the Inventory was Represented on Debtor's Balance Sheet

Debtor was a hunting and fishing-oriented retail business, completely owned by Sohail Abdulla.  Debtor occupied a 63,000 square foot building in a highly visible and desirable commercial area in Augusta, Georgia. The Trustee argues that the only asset of any value which remained in the business at the time of conversion in 2008 was Debtor's inventory.  For the reasons that follow, I find that Debtor's valuation of the inventory is the fair value.

---

[1] The "look back" period—the period during which the Trustee can avoid transfers—under 11 U.S.C. § 548 is two years. Under 11 U.S.C. § 547 the "look back" period is ninety days for non-insiders and one year for insiders.

### a. Debtor's Valuation

At the date of filing (March 13, 2007) Debtor's schedules revealed $3.8 million in assets and $2.2 million in liabilities.[2] $2.2 million of those assets were in Debtor's inventory. Schedule B, Dckt. No. 41 (Apr. 5, 2007). Based on these valuations, Debtor maintains that is was solvent at all relevant times.

In support of its case, Debtor relied on the expertise of its CPA, Brian Leonard. Leonard prepared Debtor's tax returns from records produced by Abdulla's wife (who did the day-to-day bookkeeping). Part of Leonard's obligation in preparing the tax returns was the preparation of an income statement and a balance sheet to be attached to each return. *See* Exhibits P-50 and P-52. The value of the inventory at the end of each year was listed on that balance sheet. To obtain the year-end inventory value, Leonard began with the previous year's inventory number and adjusted it to reflect the value derived from an actual physical count of the inventory (conducted by Debtor's employees). Leonard applied historical cost numbers to the physical inventory on hand and made the required accounting adjustments to conform the balance sheet and the income statement. These accounting adjustments reflected the actual inventory on hand at the end of each year. *See* Exhibit P-50. Debtor reported sales, inventory, net income, and net worth in the years from 2003 forward as follows:

---

[2]   Except where the precise number is material I will utilize rounded or approximate numbers throughout this opinion.

|      | Sales | Inventory | Net Income (negative) | Net Worth (negative) |
|------|-------|-----------|-----------------------|----------------------|
| 2003 | $3.3 million | $2.2 million | $4,461 | $0.4 million |
| 2004 | $3.3 million | $2.4 million | $14,712 | $0.4 million |
| 2005 | $3.2 million | $2.5 million | $120,679 | $0.6 million |
| 2006 | $2.5 million | $2.2 million | ($202,129) | $0.4 million |
| 2007 | $1.5 million | $1.4 million | ($718,677) | ($0.3 million) |

*See* Exhibit P-50. Leonard concluded that the company operated at a relatively small profit for 2003, 2004 and 2005, but that it lost considerable sums of money in 2006 and 2007. In the end Debtor's debt was escalating, its sales were dropping, and its viability ultimately became untenable. Leonard concluded that Debtor became insolvent sometime in 2007. Debtor remained current in all of its tax and other obligations until at least that time, and based on Debtor's books and records, the company was indeed solvent until sometime in 2007. Exhibit P-52. Because Debtor's schedules showed solvency on the Petition Date, Debtor asserts that it only became insolvent sometime after March 13, 2007.

### b. The Trustee's Valuation

Coleman was appointed Trustee on the day the case was converted and immediately visited the store. By that time Debtor's bankruptcy case had been pending for approximately sixteen months. Coleman observed that about one-half of the square footage was being used to display retail inventory for sale and approximately one-half was being used to warehouse assets which were owned Abdulla. Still, Coleman found substantial inventory in guns and ammunition, fishing and hunting supplies, gear and supplies, clothing, boots, and

other outerwear.  Coleman also found a large number of racks of damaged items, empty boxes, and dated inventory, all of which appeared to be disorganized.

Doubting the accuracy of Debtor's scheduled inventory values, Coleman retained Dwayne Smoak as an expert witness.  Smoak is a CPA with more than ten years of experience and has also been certified as a valuation analyst.  He reviewed Debtor's 2003-2007 tax returns and the profit and loss statements and concluded that the company was insolvent by December of 2003 and remained insolvent throughout all relevant periods.  He testified, and the Court agrees, that while balance sheet numbers according to Generally Accepted Accounting Principles ("GAAP") must be reported at the lower of cost or market value, adjusting asset and liability values to a "fair valuation" is the appropriate methodology for determining solvency in the context of this case.

Although the balance sheet shows solvency, Smoak based his opinion of insolvency on adjustments to Debtor's asset values which he deemed necessary.  Because inventory represented the vast majority of value in the company, he endeavored to calculate its "fair value."  To do so, he compared the company's inventory turnover ratio[3] to Risk Management Association ("RMA") averages for comparable business in the comparable region.  Smoak believes that because Debtor's inventory turnover ratio was lower than the industry average, the inventory value should be reduced to a level which will result in a normalized industry inventory turnover rate.  He found that Debtor had the following

---

[3]The ratio is calculated as "Cost of Sales ÷ Inventory."  Exhibit D-5, p. 15.

AO 72A
(Rev. 8/82)

inventory turnover ratios, compared to the industry norm:

| Year | Debtor's Ratio | Industry Ratio |
|------|----------------|----------------|
| 2003 | 1.64 | 2.30 |
| 2004 | 1.06 | 2.10 |
| 2005 | 0.95 | 1.90 |
| 2006 | 0.65 | 1.90 |
| 2007 | 0.76 | 2.20 |

Exhibit P-50. Clearly, Debtor's inventory was not moving as quickly as the industry norm. In a perfect world, because Debtor's turnover ratio was substantially different from the norm, Smoak would have ordered an appraisal of the inventory to determine its actual value. He would not normally adjust the inventory value based on the RMA turnover ratio alone. Rather, it would be a flag which would alert him to conduct further due diligence. However, in this case—because the inventory is long since gone—he felt that he had no option but to adjust the inventory value based solely on this ratio.

Smoak's adjustments reduce the value of the inventory in order to yield the industry norm in turnover ratio. As illustrated in Exhibit D-3, adjusting the value of Debtor's 2003 inventory in order to "normalize" the turnover ratio resulted in a reduction of the inventory value of $535,000.00. The offsetting bookkeeping entry required to reduce the inventory by that amount requires an increase in the cost of goods sold by the same amount. That adjustment yields a negative adjustment to the balance sheet in the same amount and

turns the 2003 profit of $4,461.00 to a loss of $530,539.00. *See* Exhibit D-4. Based on this, Smoak concluded that the company was insolvent from 2003 forward. He ultimately concluded that by December of 2007, the inventory value had fallen to $245,291.00.

The probative value of the Smoak methodology is pivotal to my ruling. On cross-examination Smoak conceded that the RMA itself cautions that the ratios are to be used as a "guide only," and that he agrees with that limitation. The RMA "recommends you use [the ratio] data only as general guidelines and not as absolute industry norms." Exhibit D-5, p. 2. However, Smoak reiterated that because the inventory was gone, the RMA averages were the best source available.

Smoak also conceded on cross-examination that it was possible that the turnover of this company was slower than the industry norm because it carried an abnormally high amount of inventory for the size of his business. The RMA cautions that "[l]ow inventory turnover can indicate poor liquidity, possible overstocking, or obsolescence. On the positive side, it could indicate a planned inventory buildup in the case of material shortages." Id. at p.15. Further, it warns that "[a] problem with this ratio is that it compares one day's inventory to cost of goods sold and does not take seasonal fluctuations into account." Id. Smoak was unable to disprove the value of the inventory in Debtor's bankruptcy schedules by any method other than his RMA-based methodology. Finally, Smoak testified that an actual physical inventory would be a better indicator of the value of the inventory.

Indeed, Steve Farmer, a CPA since 1988, was qualified as an expert by the Defendants and prepared a report concluding that Debtor was solvent. Farmer disputed Smoak's methodology, pointing out that the turnover ratio is only a benchmark (or "sanity check") used by a company to compare itself to others within its industry. It can also be used by lenders or potential purchasers who might use the turnover ratio to determine what potential value the company might achieve if operated in a more efficient manner.

Defendants raised a Daubert objection to Mr. Smoak's testimony in pre-trial proceedings, and they renewed that objection at the close of his testimony.[4]  I denied those Motions to Strike on an interim basis, choosing to hear the evidence at trial and decide the motions thereafter.  I heard the evidence at the February 17, 2011, hearing, and have carefully considered the Motion to Strike Smoak's testimony based on the authority of Daubert and its progeny.[5]  The Defendants contend that the Smoak testimony is inadmissible for the following reasons: 1) the Plaintiff has the burden of proving the acceptability of the expert testimony under Daubert; 2) the Plaintiff has the burden of proving that his methodology is recognized in the field; 3) Smoak admits that it is not normal to use RMA

---

[4] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993) (holding that for expert testimony to be admissible, "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  The Court went on to discuss specific factors used "in determining whether a theory or technique is scientific knowledge that will assist the trier of fact . . . .").

[5] The Eleventh Circuit Court of Appeals has interpreted Daubert to mean that "[e]xpert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact."  Club Car, Inc. v. Club Car (Quebec) Import, Inc., 362 F.3d 775, 780 (11th Cir. 2004), abrogation on other grounds recognized by Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc., 593 F.3d 1249, 1258 n.7 (11th Cir. 2010).

ratios exclusively; and 4) Smoak admitted that it is equally possible that Debtor simply carried more inventory than the industry average.

I choose not to strike Smoak's testimony in its entirety. However, given Smoak's own recognition that the RMA analysis would ordinarily lead to further due diligence—and not to a final conclusion on value—Smoak's RMA-based adjustments are entitled to little weight. The RMA analysis is simply beset by too many gaps. The methodology is of questionable reliability as an exclusive tool to value inventory, and it fails to answer the crucial question of how inventory which Smoak valued at $245,291.00 in December of 2007 sold for $960,105.19[6] in October of 2008. I therefore conclude that the Trustee has failed to carry his burden of showing that the inventory figures advanced by Debtor in its tax returns and its Monthly Operating Reports are incorrect.

### c. The Actual Proceeds Derived from the Sale

The Trustee hired Rowell Auctions, Inc., which conducted a two-phased auction in October of 2008. Rowell operated the business as an ongoing retail concern for approximately nine days with progressively deeper discounts on all merchandise. During that nine day period the Trustee realized gross receipts of approximately $508,646.04. Final Settlement, Dckt. No, 480, p. 8. The store was then closed for two days during which an auction of all the remaining inventory took place, yielding an additional $451,459.15 in

---

[6] While the Trustee testified that the auction grossed $983,655.19, that sale included inventory, equipment, and fixtures. The Auctioneer's final statement details gross *inventory* proceeds of $960,105.19. Final Settlement, Dckt. No. 480, p. 8.

AO 72A
(Rev. 8/82)

proceeds. Id. That sale process had been approved by Judge Dalis on September 16, 2008. Consent Order, Dckt. No. 423. On December 17, 2008, the Trustee reported to the Court gross receipts of $983,655.19, an amount which included the sale of other assets. See Exhibit D-10. From those gross proceeds the Trustee was required to pay certain fees and expenses which resulted in net proceeds from the auctioneer of $727,583.57. Final Settlement, Dckt. No. 480, p. 1. The Trustee had certain additional obligations for administrative expenses and for rent due to the landlord; he ultimately remitted approximately $567,082.31 to Southern Bank, which held a first lien position in Debtor's inventory. The Trustee also reimbursed Southern Bank for approximately $20,673.79 of utility expenses.

### d.  This Court's Valuation

I find that Debtor's valuation of the inventory is correct. The competing valuations are as follows, as compared to the actual sale price:

|  | Debtor's Value | Smoak's Value | **Gross Liquidation Sale Price** |
|---|---|---|---|
| December 2003 | $2,230,874.00 | $1,695,874.00 | **N/A** |
| December 2004 | $2,437,185.00 | $1,268,185.00 | **N/A** |
| December 2005 | $2,501,722.00 | $1,274,222.00 | **N/A** |
| December 2006 | $2,223,693.00 | $680,193.00 | **N/A** |
| December 2007 | $1,432,291.00 | $245,291 | **N/A** |
| July 2008 | $1,532,702.93 | N/A | **N/A** |
| October 2008 | N/A | N/A | **$960,105.19** |

Debtor's scheduled inventory value exceeds the sales proceeds, an unremarkable fact, given that the proceeds were obtained through an inventory liquidation sale over an eleven day period. Those proceeds yielded approximately 60% of the value reported on Debtor's June Monthly Operating Report. Smoak testified that liquidation value of inventory would typically be as low as 25%, and that a 50% recovery would be "astronomical," and "very, very good." The "fire sale" inventory proceeds of $960,105.19 would represent a liquidation value of almost 400% of Smoak's December 2007 inventory value. Debtor's Monthly Operating Reports for the period from January 2008 through June 2008 (shortly before the case was converted) show inventory purchases of $242,178.72. Even if Debtor sold *none* of its inventory over that six month period, adding that inventory value to Smoak's adjusted December 2007 value would have yielded only $487,469.72. As previously noted, the liquidation sale in October grossed $960,105.19. The actual liquidation number was almost 200% of the above-mentioned hypothetical total.

There is simply no explanation for the fact that inventory valued by Smoak at $245,291.00 in December of 2007 (even if augmented by subsequent purchases) could sell at liquidation nine months later for $960,105.19.

I find that the inventory was at all times worth what Debtor showed in its books and schedules. In so concluding, I reject the opinion evidence offered by Smoak as being based on weak (and perhaps faulty) methodology, as being in direct conflict with the sworn documents filed by Debtor, and as being in direct conflict with the demonstrated value

of the inventory during the "fire sale."

## 2.  The Power Link Receivable was Properly Included in Debtor's Assets

Debtor's Schedule B-16 reveals a receivable (an asset) due from Power Link of $255,215.83. Debtor continued to carry the Power Link receivable of $255,215.83 on its books because Debtor believed in good faith that it was a collectable account. Abdulla knew Power Link's owner personally and believed that the newly established company would become profitable and would ultimately be able to pay its obligation. The Trustee brought an Adversary Proceeding to collect the Power Link receivable. On February 17, 2011, the parties in that proceeding announced a consent judgment in the amount of $250,000.00. The Trustee has consistently taken the position that the receivable is uncollectable due to the collapse of the Power Link business. Based on the Trustee's current belief that the judgment is uncollectable, he asserts that for the purposes of determining insolvency, the $255,215.83 value of that receivable should be excluded from Debtor's adjusted balance sheet.

Notably, Debtor could have taken a tax beneficial charge-off for bad debt based on Power Link's failure to pay the note. However, Debtor continued to carry the receivable as an asset on the books, foregoing the tax benefit Debtor would have received by charging off the debt. Farmer agreed with Defendants' assertion that because Debtor continued to carry the receivable on the books—instead of charging it off to achieve a reduction in its tax liability—it appeared at the time to be a collectable debt. There is no dispute over the amount of the debt because the parties have stipulated to a consent

judgment. Given the intervening turmoil in the American economy, the receivable's alleged *current* uncollectability is not enough to carry the Trustee's burden of showing the receivable's uncollectability *as of March 13, 2007*. I conclude that the Power Link receivable was fairly valued at $255,215.83 as of the Petition Date.

### 3. The Guaranty was Properly Excluded from Debtor's Liabilities

Abdulla owned a single member LLC known as Why Pay More, LLC, which borrowed $1.7 million from Georgia Bank and Trust Company of Augusta on May 31, 2005. *See* Exhibit P-21. The loan proceeds were used to purchase property in Evans, Georgia, located in a prime retail location. The loan was secured by the property which was acquired, other real estate, and a personal guaranty by both Abdulla and Debtor dated May 31, 2005. *See* Exhibit P-29. The Trustee has contended that Debtor's guarantee of the debt should have been reflected from that point forward as a liability on Debtor's balance sheet. The Trustee further contends that if the $1.7 million liability had been included on the balance sheet, Debtor became insolvent no later than May of 2005.

However, under GAAP, it is not required that a contingent liability of a guarantor be listed as a liability on the company's balance sheet (except in limited circumstances which are not relevant here).[7] When pressed, Leonard testified that if he were *required* to list a contingent liability on the balance sheet, he would include the

---

[7]Farmer and Leonard agreed that the $1.7 million guaranty issued by Debtor should not be shown as a liability on the balance sheet.

corresponding value of the security for that debt as an offsetting asset. In other words, only the net number (either positive or negative) between the value of the asset and the amount of the guaranty would have any effect on the balance sheet. There was no evidence of the value of the property in 2007 which would suggest that the guarantors had any net exposure. I agree that to fairly value the impact of the guaranty on the balance sheet, it is imperative that I look at the actual net exposure of the guarantor, and not merely the amount of the liability without any offset. I therefore conclude that Debtor's issuance of the guaranty requires no adjustment to the balance sheet.


### 4. The Lawsuit was Properly Included in Debtor's Assets

Debtor also listed as an asset a $1.05 million lawsuit against U.S. Properties Group (Debtor's landlord). Schedule B, Dckt. No. 41. The claims against the landlord were based on an allegation of bad faith eviction, evidenced by the landlord's failure to maintain the property which had a leaking roof and other deficiencies. That bad faith eviction effort was allegedly motivated by Debtor's contractual rent on the property, which was substantially below market. *See* Exhibit D-21 (showing that U.S. Properties had proposed a lease termination agreement in August 2005 in exchange for termination payment to Debtor of $1.6 million). The lease was in its fourth year (with six remaining years) at the time U.S. Properties proposed the settlement. Lease, Dckt. No. 312-1 (May 5, 2008). The lease was in its sixth year (with four remaining years) when Debtor filed its Chapter 11. Judge Dalis allowed the assumption of that lease during the pendency of the Chapter 11. Order, Dckt. No. 286 (Apr. 2, 2008).

AO 72A
(Rev. 8/82)

The Trustee ultimately concluded that Debtor's claim against the landlord was of dubious value and did not pursue it after the case was converted. This Court is unaware of the reasoning behind that decision, but that decision would be supported at least in part by the fact that the claim would continue to diminish in value as the lease expiration date drew nearer. However, I find that because U.S. Properties had offered a $1.6 million lease buy-out to Debtor for the remaining six years of the lease, there remained significant value in the remaining four years of the lease in March of 2007. Debtor scheduled that value at $1.05 million and no contrary evidence was introduced on that point.

## CONCLUSIONS OF LAW

### The Legal Standard

The Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property . . . made while the debtor was insolvent . . . ." 11 U.S.C. § 547(b)(3). This Code provision allows the Trustee to avoid transfers made within ninety days of the petition date, or within one year of the petition date of the transfer was to an insider.

The Code also provides that "[t]he trustee may avoid any transfer . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . . was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation

. . . ." 11 U.S.C. § (a)(1)(B).  The Trustee alleges that the transfers at issue in this case were made preferentially, or alternatively that such transfers were made fraudulently.

## The Burden of Proof

In an action to establish either preferential transfer or fraudulent conveyance, the burden is on the Trustee.  *See e.g.,* In re Keith Eickert Power Prods., LLC, 344 B.R. 685, 687 (Bankr. M.D. Fla. 2006) (noting that the Trustee bears the burden of proof under 11 U.S.C. § 548); 11 U.S.C. § 547(g) ("For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section . . . ."); In re Scott Wetzel Servs., Inc., 278 B.R. 613, 617 (Bankr. M.D. Fla. 2002) (noting that the Trustee bears the burden of proof under 11 U.S.C. § 547).  Accordingly, the burden is on the Trustee to prove insolvency in this matter.

## Solvency

The Bankruptcy Code defines corporate insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation . . . ." 11 U.S.C. § 101(32); *see also* In re Taylor, 228 B.R. 491, 502 (Bankr. M.D. Ga. 1998).  Smoak's definition mirrored this definition, and is accepted by all the witnesses in this case.  Smoak testified, and the Court agrees, that while balance sheet numbers, according to GAAP, must be reported at the lower of cost or market value, the appropriate methodology for determining true solvency or insolvency is to adjust asset and liability values to a "fair valuation."  This is in line with guiding authority.  *See e.g.,* In re Taylor, 228

B.R. at 502.

However, my knowledge today that assets are worth less today cannot be retroactively applied to the balance sheet at the time of the petition. "[A]ssets must be valued at what they are reasonably worth at the time of the allegedly preferential transfers and not what they turned out to be worth at some time after the bankruptcy intervened." In re Davis, 120 B.R. 823, 825 (Bankr. W.D. Pa. 1990) (citing Cissell v. First Nat'l Bank of Cincinnati, 476 F.Supp. 474, 482 (S.D. Ohio 1979)); In re Coated Sales, Inc., 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992); but c.f. In re Sierra Steel, Inc., 96 B.R. 275 (9th Cir. BAPCPA 1989) ("[T]here is no policy reason why judges should not be allowed to consider subsequent events such as the actual collection rate for receivables, in valuing assets and determining liabilities."). While I agree that there is support for considering subsequent events—such as actual collection amounts—as a tool for establishing "fair value" at an earlier date, that assessment cannot be static or mechanical, but must be weighed against other conditions which may have also affected "fair value."

At the time of the petition, Debtor believed that the Power Link receivable and the U.S. Properties lawsuit had the values listed on the balance sheets. The Trustee, with the benefit of hindsight, seeks to retrofit the historical balance sheets using current values. However, between March of 2007 and today the American economy has suffered a catastrophic melt-down. In this Court's all-too-frequent experience, asset values today simply have no relevance to their "fair values" in 2007. Thus, while I would consider

subsequent events to inform my valuation of assets at an earlier time in usual circumstances, these are not normal times. Even accepting the Trustee's good-faith belief in the current value of these assets to be correct, that value is not indicative of the value in 2007.

As for the effect of the guaranty, a contingent liability may be included in an insolvency analysis, but in order "[t]o value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." See e.g., Baldi v. Samuel Son & Co., Ltd., 548 F.3d 579, 582 (7th Cir. 2008) (listing cases). The Trustee was unable to carry the burden of proof on this matter, and I conclude that the guaranty did not render Debtor insolvent. For the reasons stated above, I find that the guaranty—even if it were carried on the balance sheet as a liability—would necessarily be offset by the value of the asset which secured it. There would be no negative effect on Debtor's balance sheet.

## CONCLUSION

Because I find that Debtor's inventory was fairly valued at the amount listed on its balance sheet, I find that as of the Petition Date, the inventory had a fair value of $2,223,692.75. Because I find that the $255,215.83 Power Link receivable was fairly valued on Debtor's balance sheet, I find that as of the Petition Date, that number was correctly included in Debtor's assets. Because I find that the lawsuit was fairly valued on Debtor's balance sheet, I find that as of the Petition Date, the lawsuit added a value of $1,050,000.00 to Debtor's assets. Those three assets have a combined value of at least $3,528,692.75.

Because I find that the guaranty was properly excluded from Debtor's balance sheet, I find that as of the Petition Date, the liabilities were fairly valued at $2,281,665.39. I find that Debtor's balance sheet, at all times prior to the petition, reflected the fair value of Debtor's assets and liabilities.

Consequently, Debtor was solvent on the Petition Date and at all relevant earlier times, and only became insolvent sometime after the Petition Date. Insolvency is a common and necessary element which the Trustee must prove in order to prevail in each of these cases. 11 U.S.C. §§ 547 and 548. With no showing of insolvency, there is no basis on which he could prevail in the next phase of any of these cases.

## O R D E R

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that these Adversary Proceedings are DISMISSED.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 24th day of May, 2011.